Lewis, Appellant, vs. Industrial Commission of Wisconsin and others, Respondents.

*September 15—October 10, 1922.*

*Workmen's compensation: Death by sunstroke: Hazard peculiar to employment: Findings of industrial commission: Weight.*

1. Compensation for death from sunstroke can be awarded by the industrial commission only where the injury is one resulting from a hazard inseparably connected with the industry or substantially increased by reason of the nature of the employment; and where exposure to the hazard was not substantially different from that of ordinary outdoor work, no award of compensation can be made.
2. Under sec. 2394—19, Stats., providing that the finding of facts made by the industrial commission, acting within its powers, shall, in the absence of fraud, be conclusive, the findings will not be set aside if there is any support for them in the evidence; and where from undisputed facts different reasonable inferences can be drawn, a finding has all the conclusive effect of a finding on conflicting evidence.
3. Where different inferences could reasonably be drawn from the evidence, a finding of the commission that sunstroke

causing the death of a coal heaver was not a hazard peculiar to his employment cannot be said to be unreasonable or to have no foundation in the evidence.

DOERFLER, ESCHWEILER, and CROWNHART, JJ., dissent.

APPEAL from a judgment of the circuit court for Dane county: E. RAY STEVENS, Circuit Judge. *Affirmed*.

Plaintiff's husband sustained a sunstroke July 9, 1921, while working for the *Interstate Coal & Dock Company* at its coal yards in Green Bay. Compensation is sought by the widow. The *Industrial Commission* found that the death of the deceased was not due to a hazard incidental to or peculiar to his employment and denied compensation. Upon appeal to the circuit court the order of the *Commission* was affirmed and plaintiff appealed.

For the appellant there was a brief by *Cady, Strehlow & Kaftan* of Green Bay, and oral argument by *Robert A Kaftan*.

For the respondent *Industrial Commission* there was a brief by the *Attorney General* and *Winfield W. Gilman*, assistant attorney general, and oral argument by *Mr. Gilman*.

For the respondents other than the *Industrial Commission* there was a brief by *Quarles, Spence & Quarles*, attorneys, and *Arthur B. Doe*, of counsel, all of Milwaukee, and oral argument by *Mr. Doe*.

VINJE, C. J. The *Commission* found these facts:

"Joseph Lewis had been employed by the respondent for many years. During the summer. of 1921 and particularly during the time prior to July 7, 1921, there was a lull in the work at the coal yard, but the crew was kept together at 'tinkering' about the yard in order to keep the crew together. The evidence is quite convincing that on July 6th and also on the 7th the men did very little work. On the 6th, after putting in the full day but working only about an hour, the men were permitted to return and to leave their work at four in the afternoon and to come back to work in the evening in order to clean out the pockets in a coal boat.

That night it appears that the deceased was somewhat fagged out and did not sleep well because of the extreme heat. On July 7th he came to work very early and seemed to be in good spirits. The crew did very little work that morning, only to clean out a car and do other little jobs about the yard. The men were engaged at that work possibly an hour, which in ordinary times would not have taken more than twenty minutes to do.

"Both days, that is, the 6th and 7th, were extremely hot, as shown not only by the testimony of the men who worked in the yard but also by the records of the weather bureau as taken at Green Bay. It was not only hot in the yards but it was hot throughout the city, and was possibly somewhat cooler at the yards because of the fact that it was near the river. At any rate it was no hotter at the yards than anywhere else in the city of Green Bay on those days.

"After eating their lunch on the premises the men were engaged in tying down a 'rig' used in the loading and unloading of coal. After that was done the deceased went to get a drink of water and became sick. He was assisted to the office of the respondent. At this point he vomited and was then taken home. It was found that he had suffered from a sunstroke, and as a result thereof he died during the course of the day."

The facts found by the *Commission* are sustained by the evidence. It further found "that the deceased was not injured as a result of any hazard of his employment, but met his death as a result of a hazard which was the hazard of the community."

The trial judge in sustaining the order of the *Commission* said:

"The facts are not in dispute. The rule of law applicable to this case is likewise well settled. Compensation can be awarded only where the injury is one 'resulting from a hazard pertaining to and inseparably connected with the industry or substantially increased by reason of the nature of the services' which the employee is required to perform. *Schroeder & Daly Co. v. Industrial Comm.* 169 Wis. 567, 568, 569, 173 N. W. 328. If exposure of deceased to hazard from sunstroke 'at the time and place of injury was not

different substantially from that of ordinary out-of-door work,' no award of compensation can be made. *Hoenig v. Industrial Comm.* 159 Wis. 646, 649, 150 N. W. 996.

"The question whether the hazard was that incident to ordinary out-of-door work, or whether it was one which pertained to and was inseparably connected with and substantially increased by decedent's employment, was primarily a question of fact to be found by the *Commission.* The finding of the *Commission* that the deceased met his death as a result of a hazard which was the hazard of the community and not peculiar to the employment is amply sustained by the evidence, as will be seen by a very brief review thereof. Extreme heat prevailed everywhere. Persons in all walks of life suffered sunstroke in decedent's community during this hot spell. He was not required to perform heavy labor during the day on which he suffered the sunstroke. Work proceeded in a very leisurely fashion. The place of employment, because of its location on the river and away from the center of the city, was 'naturally cooler than up town.' He did about two hours of light work during the day preceding his prostration. When not at work men 'sat in the shade.'"

We concur in what is said by the trial judge and little need be added. By a long, unbroken line of decisions this court has held that the statutory mandate of sec. 2394—19, Stats., to the effect that "the findings of fact made by the *Commission* acting within its powers shall, in the absence of fraud, be conclusive," means just what it says, and such findings will not be set aside if there is any support for them in the evidence. *Northwestern Iron Co. v. Industrial Comm.* 154 Wis. 97, 142 N. W. 271; *Nekoosa-Edwards P. Co. v. Industrial Comm.* 154 Wis. 105, 141 N. W. 1013; *International H. Co. v. Industrial Comm.* 157 Wis. 167, 147 N. W. 53; *Milwaukee Western F. Co. v. Industrial Comm.* 159 Wis. 635, 150 N. W. 998; *Hoenig v. Industrial Comm.* 159 Wis. 646, 150 N. W. 996; *Milwaukee v. Industrial Comm.* 160 Wis. 238, 151 N. W. 247; *Heileman B. Co. v. Shaw,* 161 Wis. 443, 154 N. W. 631; *Eagle C. Co.*

*v. Nowak,* 161 Wis. 446, 154 N. W. 636; *First Nat. Bank , v. Industrial Comm.* 161 Wis. 526, 154 N. W. 847.

It is true that where only one inference can be reasonably drawn from undisputed facts a question of law arises, as in *Radtke Bros. & Korsch Co. v. Rutzinski,* 174 Wis. 212, 183 N. W. 168; but where from undisputed facts different reasonable inferences can be drawn, a finding by the *Commission* has all the conclusive effect of a finding on conflicting evidence. *Milwaukee Western F. Co. v. Industrial Comm.* 159 Wis. 635, 150 N. W. 998; *Porter v. Industrial Comm.* 173 Wis. 267, 181 N. W. 317. In the latter case, where the evidence was not conflicting, it was said: "An examination of the evidentiary facts adduced before the *Commission* clearly permitted of . . . different inferences. . . . Under this state of the evidence their determination of that fact cannot be disturbed by the courts and must stand as the final conclusion in this case." Here different inferences could reasonably be drawn, hence that reached by the *Commission* is conclusive. It is urged that physical labor has a tendency to induce sunstroke. No doubt it has, but physical labor is not a hazard peculiar to a coal-heaver. It is common to almost all kinds of labor. Mental exhaustion is also conducive to sunstroke, indeed all forms of exhaustion tend to render a sunstroke more probable. The *Commission* had all the facts before it, and from them it drew the inference that the sunstroke suffered by the deceased was not a hazard peculiar to his employment. We cannot say that such an inference had no foundation in the evidence or was unreasonable and therefore its conclusion must prevail.

*By the Court.*—Judgment affirmed.

DOERFLER, J. (*dissenting*). From the majority decision of the court in this case I respectfully dissent.

From July 1 to July 7, 1921, the weather was extremely

hot, and the 6th and 7th days of July were the hottest of the year. The official thermometer of the United States weather bureau on the 6th day of July, 1921, at the city of Green Bay, Wisconsin, registered 81° at 7 a. m., 101° at 12 m., and 96° at 4 p. m., 95° at 7 p. m., and 80° at midnight. On the 7th of July the same thermometer registered 78° at 7 a. m., and thereafter gradually rose until 12 m., when it registered 99°. At about 2 p. m. there was a sudden drop, due to a storm.

On July 6th the deceased worked from 7 a. m. until 12 m., and from 12:30 p. m. until 4 p. m., and from 7 p. m. until 1:30 a. m. of the following morning. On the 7th he began work at 7 o'clock a. m. and continued until 12 m., returned to his work at 12:30, continuing until about 1 p. m., when he was afflicted with a sunstroke, from the effects of which he shortly thereafter died.

On the 6th of July the deceased was engaged in cleaning cars and in work in and about the defendant's coal yard, and from 7 o'clock in the evening of that day until 1:30 of the following morning he was employed in shoveling coal in the hold of a large boat. On the 7th of July he was engaged in cleaning cars and in attending to the loading of several cars, and after resuming work at 12:30 p. m. of that day, up to the time he received the sunstroke, he was engaged in tieing down the bridge, which work consisted in putting four wedges under each one of the trucks where the truck runs on the rail.

The evidence also shows that a very large portion of this work was done while the deceased was subjected to the sun's rays, and that while doing the work in the hold of the boat the heat was not only excessive but the atmosphere was close. The deceased and the other men employed were permitted to work leisurely, and the treatment of the men while at work, on the part of the employers, during this excessive spell of heat, may be considered humane. From

7 in the morning of the 6th of July until 1:30 p. m. of the following day, however, the deceased was at his employment for a period of about twenty hours, and during this time had less than five hours of sleep. It also appears that whatever sleep the deceased had on the morning of the 7th was imperfect and very much disturbed because of the heat.

In its opinion the *Commission* found, among other things, as follows:

"It appears clearly from the record that at no time were the men rushed in their work and that as a matter of fact they were working very leisurely. Under all the circumstances under which this deceased was working on July 7th, it is difficult indeed to see how the employment added any hazard which would increase in any way the possibility of a sunstroke."

This finding is clearly vulnerable, and does not take into consideration the full facts. It is true that in considering solely the deceased's work from 7 a. m. until 1 o'clock p. m. on the 7th of July, in view of his humane treatment during those hours, it might logically be said that the findings of the *Commission* involved the determination of a question of fact, which finding under the decisions of this court cannot be disturbed. In my opinion, however, the sunstroke was not primarily due to the work which was performed on the 7th of July. With but three hours' intermission, barring the usual time allotted for meals, the deceased worked from 7 in the morning of the 6th until 1:30 o'clock of the morning of the 7th, during all of which time the heat was excessive and almost unendurable, and for a period of six and one-half hours at night he was engaged in shoveling coal in the hold of the boat. The place of employment was in close proximity to the Fox river, and it can be readily assumed that more or less humidity prevailed in the atmosphere. On returning to his home shortly after

1:30 a.m. of the 7th he manifested symptoms of great exhaustion. The facts above detailed represent in substance the undisputed evidence in the case.

In order to come within the purview of the compensation act the injury must be either one peculiar to the industry or substantially increased by reason of the nature of the services which the employee is required to perform. The question involved in this case is, Did the nature of the deceased's employment expose him to a hazard from sunstroke which was substantially increased by reason of the services which he was required to perform? *Ellingson L. Co. v. Industrial Comm.* 168 Wis. 227, 169 N. W. 568.

Under the decisions of this court the findings of fact by the *Industrial Commission* are not to be disturbed where there is any substantial basis for them in the evidence. *Hoenig v. Industrial Comm.* 159 Wis. 646, 150 N. W. 996; *Hackley-Phelps-Bonnell Co. v. Cooley,* 173 Wis. 128, 179 N. W. 590; *Lezala v. Jazek,* 170 Wis. 532, 175 N. W. 87, 176 N. W. 238; *E. Weiner Co. v. Freygang,* 171 Wis. 187, 176 N. W. 781. Where, however, the facts upon which the finding is based are undisputed, the question whether the exposure to a hazard is substantially increased by the nature of the services which the employee is required to perform becomes a question of law. *Radtke Bros. & Korsch Co. v. Rutzinski,* 174 Wis. 212, 183 N. W. 168.

In the *Ellingson Case, supra,* this court held that where a woodsman on a very cold day was obliged to work harder than usual and as a result his feet became wet from perspiration and froze as he returned to camp, the exposure to injury by freezing was substantially increased by reason of the nature of the services he was obliged to perform, and that the injury was proximately caused by accident within the meaning of sub. (3), sec. 2394—3, Stats.

Extreme heat and extreme cold have a tendency to affect the human body disastrously, and if continued for a sufficient length of time produce death; in fact, heat and cold

are but relative terms indicative either of the presence or absence of heat in a greater or lesser degree. In the *Ellingson Case* the nature of the work was so strenuous as to produce a superabundance of heat, which found relief and regulation for the time being in the decreased temperature of the body resulting from the evaporation of the perspiration. Physical activity stimulates the circulation, and such increased circulation increases the heat, and when the degree of heat in the system becomes excessive so as to be detrimental to well-being, nature has provided for this self-regulating cooling process by means of perspiration. In other words, the natural function of exuding perspiration acts upon the system like a safety valve in a steam engine. The lower the temperature of the atmosphere the greater the amount of physical exertion required to produce perspiration; and the reverse is also true, that the higher the temperature the less amount of exertion required to produce the same effect. In fact, during the extreme heat of the summer, perspiration takes place without any physical exertion. While in the *Ellingson Case* the strenuous labor, with the natural phenomena of perspiration and the subsequent chill, combined in producing the freezing, in the instant case the extreme heat, combined with the long hours of labor and the failure to afford opportunity for sleep and the rebuilding of the system, resulted in a condition where the natural functions of the body designed to counteract the effects of extreme heat were so exhausted as to prevent their further beneficial operation, which resulted in sunstroke and death. Both cases were due to the inability of the system to further provide the necessary regulatory requirements. So that, fundamentally, there is little difference between the *Ellingson Case* and the instant case. In the instant case the disastrous results came about by exhaustion due to an extremely excessive call upon the natural functions resulting from extreme heat, increased and accentuated to a marked degree by excessive hours of activity

without affording a corresponding and necessary oppor-
tunity for sleep and the rebuilding processes. Shakespeare
has correctly said that sleep is "the chief nourisher in life's
feast."

Draper, in his great work on Legal Medicine, in treating
of sunstroke, on page 461 says:

"Although the immediate cause of the attack is exposure
to extreme heat, there are several factors which deserve
mention as efficient allies of the heat in bringing victims
into danger. These factors need hardly anything beyond
their enumeration, they are so obvious. The subject of a
heat stroke has his chances of recovery lessened and his
risk of dying increased if he has indulged in physical exer-
tion while exposed. Heat exposure wants no better ally
than muscular fatigue to bring its victim down. . . . The
laboring classes are more commonly stricken than their pros-
perous and more careful neighbors. . . . It is prolonged
exposure to heat which does the mischief. . . . It seems to
disarrange that marvelous heat-regulating power of the
body, which keeps the normal body temperature close to
98.6° F. through all sorts of conditions."

As was said in a concurring opinion of Lord ASH-
BOURNE in *Ismay, Imrie & Co. v. Williamson* [1908]
A. C. 437:

"Was this an accident arising out of and in the course
of his employment? With great deference to those who
hold a contrary opinion, I can myself see no room for
serious doubt on the subject. Everything was in the course
of his employment and arising out of it. But for the boiler
and the heat stroke, and the speedy exhaustion it caused,
there would have been no accident. . . . Although a heat
stroke may be called a disease, it is in this case, in my opin-
ion, a disease directly caused by an accident arising out of or
in the course of an employment particularly dangerous to
Williamson in consequence of his weak state of health."

In *State ex rel. Rau v. District Court,* 138 Minn. 250,
164 N. W. 916, it is said:

"Where the work and the conditions of the place where it
is carried on expose the employee to the happening of an

event causing the accident, there is no longer a risk to which all are exposed, and the result is an accident arising out of the employment. *Andrew v. Failsworth Ind. Soc.* 20 Times L. R. 429; *State ex rel. Virginia & Rainy Lake Co. v. District Court,* 138 Minn. 131, 164 N. W. 585, and cases cited."

It is true that it is well established and acknowledged by eminent medical authorities that the degree of heat or the degree of physical exertion required to bring on complete exhaustion and collapse or a heat or sunstroke depends to a large extent upon the physical condition of a person. A person exhausted and enfeebled by illness or indiscretions will succumb more readily than another whose vitality has not been sapped. Every human being is subject to this exhaustion and will finally succumb if the heat and the exertion continue for a sufficient length of time.

The deceased in the instant case must be deemed an average normal person. He had been employed as a laborer in and about the docks of the defendant company for many years. He had worked during the extreme cold of the winter and the excessive heat of the summer, and in many instances during long hours of continued service. There is no evidence of an inherent weakness in his system conducive to a prostration. When boats arrived loaded with coal it was usual and customary to subject the employee to many long-continued hours of labor. In the instant case, after working on the 6th of July from 7 o'clock in the morning until 4 o'clock in the afternoon with but thirty minutes intermission, he was requested by the foreman to return at 7 p. m. to finish unloading the coal out of the boat. Had he worked strenuously for seven continuous hours in the heat of the sun on the 7th of July shoveling coal and had then been subjected to this exhaustion, no question could arise of the liability of the company under the act. But here, while working leisurely during these extremely hot days in July, the long hours of duty and the short time afforded for recuperation increased to a

marked degree the hazard of sunstroke, and the two elements combined to produce the result and created a situation which fixed liability beyond doubt upon the defendants, and on the undisputed evidence in the case reduces the question of liability to one of law. *Radtke Bros. & Korsch Co. v. Rutzinski,* 174 Wis. 212, 183 N. W. 168.

It may be admitted that the inferences to be drawn from the evidence are for the *Commission,* but there must be facts in the evidence supporting such inferences, and in a proper case the findings of the *Commission* may be reversed. *Voelz v. Industrial Comm.* 161 Wis. 240, 152 N. W. 830.

The compensation act must be given a broad, liberal construction, to the end that its beneficent purpose should be carried out. *Radtke Bros. & Korsch Co. v. Rutzinski, supra.*

The risk of injury must be one incidental to the employment. Under the act an employer must anticipate the loss and make proper provision therefor for the protection of the employee, and the cost thereof not only becomes a portion of the overhead expense of the industry, but the payment thereof is ultimately passed on to the consumer and is borne by the people at large. The act is based upon the humane consideration that one who suffers injury shall not become dependent or a subject of charity but shall receive compensation during his disability; aye, it extends even farther and relieves the immediate family of an industrial worker, at least in a measure, from being dependent where the injury to the head of the family results fatally.

I cannot say that either the *Commission* or the trial court took the broad, liberal view in the administration of this beneficent act contemplated not only by the act but, by the prior decisions of this court, and, over and above all, it appears conclusively to my mind that notwithstanding the meager and unsatisfactory record the full facts were not taken into consideration, as shown by the opinions in the final determination of this case. The *Commission* is com-

posed of experts, and a more satisfactory record might have been built up; but possibly the element of time prevented. Sufficient it appears, however, to satisfy me that the conclusions were radically wrong from a legal standpoint, and the decision of the *Commission* should have been favorable to the plaintiff.

The distinction between this case and the case of *Hoenig v. Industrial Comm.* 159 Wis. 646, 150 N. W. 996, where the deceased was killed by lightning, is so marked and apparent as to require no comment.

Mr. Justice ESCHWEILER and Mr. Justice CROWNHART join in this dissent.